IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CHERYL HORTON, | |
| *Plaintiff*, | |
| | |
| v. | Civil Action No. ELH-14-3 |
| | |
| LIFE INSURANCE COMPANY OF NORTH AMERICA, | |
| *Defendant*. | |

**MEMORANDUM OPINION**

Cheryl Horton, plaintiff, and Life Insurance Company of North America ("LINA"), defendant, have filed cross-motions for summary judgment with respect to a dispute concerning a claim for death benefits sought by Ms. Horton as a beneficiary under two group accident insurance policies that are part of a welfare benefit plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), codified as amended at 29 U.S.C. §§ 1001 *et seq.* The insurance policies were issued by LINA to the employer of William G. Sawyers, the decedent and plan participant. Mr. Sawyers was Ms. Horton's domestic partner.

Mr. Sawyers was found dead in the Patapsco River on April 25, 2012, and his sailboat was found floating upside down. *See* ECF 1 (the "Complaint"). An autopsy of Mr. Sawyers revealed that he had a blood alcohol content of 0.13%. LINA's decision to deny accidental death benefits is premised on an alcohol exclusion in the insurance policies. *Id.* ¶ 10.

Claiming that LINA unlawfully denied her claim for death benefits, plaintiff filed a "Motion for Summary Judgment" (ECF 15) supported by a memorandum of law (ECF 15-1, "Horton Memo."), and exhibits. *See* ECF 15-2 through ECF 15-4. ECF 15 and ECF 15-1 shall be referred to collectively as the "Horton Motion." Defendant filed a consolidated "Cross-

Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment"
(ECF 16), inclusive of a memorandum of law ("LINA Motion").   LINA also submitted the
Administrative Record for the claim, which exceeds 500 pages.   *See* ECF 16-1.[1]   Briefing is
complete,[2] and no hearing is necessary to resolve the motions.   *See* Local Rule 105.6.

In sum, the disposition of this case turns on whether the decedent's alleged intoxication
was the cause of his death on or about April 24, 2012, directly or indirectly, in whole or in part.
For the reasons that follow, I will deny both motions.

## I.   Factual Background[3]

### A.   The Policies

Mr. Sawyers was forty-three years of age at the time of his death in April 2012.   At that
time, he was employed as a chemist by Science Applications International Corporation
("SAIC").   ECF 1 ¶ 4, Complaint.   Through his employer, *id.*, Mr. Sawyers enrolled in a group
accidental death plan funded by two insurance policies.   ECF 16-1 at 221, Horton 000221, Group
Accident Policy COA 004005; ECF 16-1 at 189, Horton 000189, Group Accident Policy OK

---

[1] The Administrative Record has been paginated with Bates numbering using the prefix
"Horton."

As an exhibit to her motion, Ms. Horton submitted "pertinent parts" of the Administrative
Record.   ECF 15-2.   Plaintiff refers to the Bates numbering of her truncated version of the
Administrative Record, using the prefix "R."   Because LINA's version of the Administrative
Record is complete, I will cite only to its version of the Administrative Record.

Neither party refers to the ECF pagination that corresponds to the pages of the
Administrative Record.   For clarity, I have included in my citations both the ECF pagination and
the Bates pagination for the full Administrative Record.

[2] Plaintiff has also filed a "Reply and Opposition to Defendant's Cross-Motion for
Summary Judgment" (ECF 17), supported by a memorandum of law (ECF 17-1, "Horton
Reply").   Defendant has filed a "Reply to Plaintiff's Opposition to Defendant's Motion for
Summary Judgment" (ECF 18 at 1-2), supported by a memorandum of law (ECF 18 at 3-17,
"LINA Reply").

[3] The factual background is drawn primarily from the Administrative Record

819515, (collectively, the "Policies").

The Policies were issued by LINA to its policyholder, the Trustee of the Group Insurance Trust for Employers in the Service Industry (ECF 16-1 at 189, Horton 000189, Group Accident Policy OK 819515; ECF 16-1 at 221, Horton 000221, Group Accident Policy COA 004005), and for the benefit of the employees of SAIC.  ECF 1 ¶ 4, Complaint.  LINA administers the Policies.  *Id.* ¶ 5.  Ms. Horton was the sole primary beneficiary of Mr. Sawyers's Policies.  ECF 16-1 at 185, Horton 000185, Beneficiary Designation Form.[4]  She is also the Personal Representative of the Estate of Mr. Sawyers.[5]  *See* ECF 16-1 at 44, Horton 000044, Letter from David Martino, Esquire, counsel for Ms. Horton, to CIGNA Group Insurance, dated October 18, 2012 ("Martino Letter").[6]

The relevant terms and definitions in the Policies are identical.  The Policies provide that LINA "will pay the benefit for any one of the Covered Losses listed in the *Schedule of Benefits*, if the Covered Person suffers a Covered Loss resulting directly and independently of all other causes from a Covered Accident within the applicable time period specified in the *Schedule of Benefits*."  ECF 16-1 at 210, Horton 000210, Group Accident Policy OK819515; ECF 16-1 at 239, Horton 000239, Group Accident Policy COA 004005.

---

[4] Mr. Sawyers listed Ms. Horton as his beneficiary on the Beneficiary Designation Form, for the Policies.  Beneficiary Designation Form, ECF 16-1 at 185, Horton 000185.  Mr. Sawyers listed his father, James Sawyers, as the "CONTINGENT BENEFICIARY(IES)."  *Id*.

[5] Ms. Horton was appointed by the Orphans Court for Anne Arundel County, Maryland.  ECF 16-1 at 77, Horton 000077, Affidavit of Cheryl Horton dated September 11, 2012, ¶ 3.

[6] LINA is a company in the CIGNA Insurance Group ("CIGNA").  Therefore, for the purposes of this Memorandum, references to CIGNA are construed as references to LINA.   In the Administrative Record, CIGNA also appears as Cigna.

A "Covered Loss" is defined as follows, ECF 16-1 at 197, Horton 000197, Group Accident Policy OK819515; ECF 16-1 at 227, Horton 000227, Group Accident Policy COA 004005:

> A loss that is all of the following:
> 1. the result, directly and independently of all other causes, of a Covered Accident;
> 2. one of the Covered Losses specified in the *Schedule of Covered Losses*;
> 3. suffered by the Covered Person within the applicable time period specified in the *Schedule of Benefits.*

The *Schedule of Benefits* lists "Loss of Life" as a "Covered Loss."  ECF 16-1 at 193, Horton 000193, Group Accident Policy OK819515; ECF 16-1 at 225, Horton 000225, Group Accident Policy COA 004005.  The Policies define a "Covered Accident" as follows, ECF 16-1 at 197, Horton 000197, Group Accident Policy OK819515; ECF 16-1 at 227, Horton 000227, Group Accident Policy COA 004005:

> A sudden, unforeseeable, external event that results, directly and independently of all other causes, in a Covered Injury or Covered Loss and meets all of the following conditions:
> 1. occurs while the Covered Person is insured under the Policy;
> 2. is not contributed to by disease, Sickness,[7] mental or bodily infirmity;
> 3. is not otherwise excluded under the terms of this Policy.

The Policies also contain "Common Exclusions" that prevent recovery of benefits.  Of particular relevance, Common Exclusion No. 10 ("Intoxication Exclusion") states, ECF 16-1 at 203, Horton 000203, Group Accident Policy OK819515; ECF 16-1 at 232, Horton 000232, Group Accident Policy COA 004005:

> [B]enefits will not be paid for any Covered Injury or Covered Loss which, directly or indirectly, in whole or in part, is caused by or results from any of the following unless coverage is specifically provided for by name in the *Description of Benefits* Section:

---

[7] "Sickness" is defined under the Policies as a "physical or mental illness."  ECF 16-1 at 198, Horton 000198, Group Accident Policy OK819515; ECF 16-1 at 229, Horton 000229, Group Accident Policy COA 004005.

\* \* \*

10.    operating any type of vehicle while under the influence of alcohol or any drug, narcotic or other intoxicant.   Under the influence of alcohol, for purposes of this exclusion, means intoxicated, as defined by the law of the state in which the Covered Accident occurred.

### B.    The Events of April 24 and April 25, 2012

Mr. Sawyers and Ms. Horton had lived together since 2001.  ECF 16-1 at 77, Horton 000077, Affidavit of Cheryl Horton dated September 11, 2012 ("Horton Affidavit") ¶ 4.  The couple shared a home in Pasadena, Maryland, purchased by Mr. Sawyers in 2005.  *Id.* ¶ 5.

In the summer of 2011, Mr. Sawyers purchased a SNARK Sunflower sailboat, which was propelled only by sail.  *Id.* ¶ 6.  In the Horton Affidavit, Ms. Horton detailed Mr. Sawyers's "long history of sailing." *Id.* ¶ 4.  She said: "As a teenager, and into his early 20s, [Mr. Sawyers] raced Hobie Cats in the Gulf Coast Region of Florida . . . ." *Id.*  Thereafter, "[h]e sailed frequently for most of his adult life" and "countless times" throughout his twelve-year relationship with Ms. Horton.  *Id.*[8]

On Tuesday, April 24, 2012, at approximately 3:30 p.m., Mr. Sawyers called Ms. Horton to inform her that he was "about to set out sailing . . . ." *Id.* ¶ 7.  A boat ramp, located on a nearby community beach, was just a "short walk" from the couple's home.  *Id.* ¶ 5.

Although the couple "regularly" sailed together in the summer, *id.* ¶ 4, it was not out of the ordinary for Mr. Sawyers to sail on his own.  ECF 16-1 at 78, Horton 000078, Horton Affidavit ¶ 7.  According to Ms. Horton, Mr. Sawyers "had been out [sailing] alone many, many times before, so [she] was not the least bit concerned" when he informed her that he planned to

---

[8] In a letter dated October 17, 2012, from forensic pathologist William Manion, M.D., Ph.D. to David C. Martino, Esq., Ms. Horton's lawyer ("Manion Letter"), Mr. Sawyers was described as a "strong swimmer" and a "certified diver" who "grew up around the water."  ECF 16-1 at 47, Horton 000047, Manion Letter; *see also* ECF 16-1 at 132, Horton 000132, Investigative Report of the Maryland Natural Resources Police dated May 4, 2012.

set sail on his own that afternoon.  *Id*.  Typically, these excursions would last "an hour or two."
*Id*.  Mr. Sawyers "would sail close to their shorefront home" and only in the "daylight hours"
because the boat was "not equipped with a motor and/or navigation lights."  ECF 16-1 at 132,
Horton 000132, Investigative Report of the Maryland Natural Resources Police dated May 4,
2012 ("Police Report of May 4, 2012").

Ms. Horton described the SNARK Sunflower as a "simple sailboat often used by
beginning sailors because the hull is filled with foam that makes it virtually unsinkable, though it
can be easily capsized in high winds."  ECF 16-1 at 77, Horton 000077, Horton Affidavit ¶ 6.
She estimated the hull of the SNARK measured approximately eleven feet and weighed about
fifty pounds.  *Id*.  The SNARK was equipped with a fifty-five square foot sail and a spar
extension (ECF 16-1 at 44, Horton 000044, Martino Letter), which Mr. Sawyers purchased in the
summer of 2011 (ECF 16-1 at 77, Horton 000077, Horton Affidavit ¶ 6), from the website
sailstogo.com.  ECF 16-1 at 44, Horton 000044, Martino Letter.  The website indicates that this
fifty-five foot sail with a spar extension is "[n]ot for winds above 18 mph."  ECF 16-1 at 53,
Horton 000053, *Sail Boats To Go*, http://www.sailboatstogo.com/catalog/PARTS/5011 (Oct. 1,
2012),

Mr. Sawyers sailed the SNARK approximately ten to twelve times during July to October
2011.  ECF 16-1 at 77, Horton 000077, Horton Affidavit ¶ 6.  But, prior to April 24, 2012, he
had not sailed the boat during the 2012 calendar year.  *Id*.  According to Ms. Horton, "[w]hen
[Mr. Sawyers] went sailing, he always brought a life jacket[9] with him in the boat (though he
would never actually put it on unless the boat would capsize) and a waterproof bag (which
contained his cellphone, a towel, and often a sweater)."  *Id*. ¶ 5.  But, during the telephone call

---

[9] Throughout the Administrative Record, life jacket is also spelled as "lifejacket."  The
term is also referred to as a personal floatation device or a PFD.

on the afternoon of April 24, 2012, Mr. Sawyers informed Ms. Horton that he could not find his waterproof bag.[10]  *Id.* ¶ 7.  Ms. Horton and Mr. Sawyers conversed about the location of the bag, and eventually Mr. Sawyers found it.  *Id.*  According to Ms. Horton, during the call Mr. Sawyers "sounded in good spirits" and "his voice betrayed nothing out of ordinary."  *Id.*  That was the last time the two spoke with each other.  *Id.*

Climatological reports taken at the Baltimore-Washington International Airport on April 24, 2012, indicate that wind speeds measured approximately eight to eleven miles per hour from 4:00 p.m. to 7:00 p.m., with the exception of one wind gust of twenty miles per hour, reported at 5:54 p.m.  ECF 16-1 at 82, Horton 000082, Quality Controlled Local Climatological Data of April 2012 ("Climatological Report").  Sunset that day was at 7:53 p.m.  ECF 16-1 at 79, Horton 000079, *Time and Date*, http://www.timeandworldclock/astronomy.html?n=419&mont=4...[11] (Sept. 6, 2012).

When Ms. Horton returned home at approximately 10:00 p.m. on April 24, 2012, Mr. Saywers was not home.  ECF 16-1 at 78, Horton 000078, Horton Affidavit ¶ 8.  Because Mr. Sawyers's SNARK sailboat was not equipped with navigation lights, Ms. Horton had expected him to be back before dark.  *Id.*; ECF 16-1 at 132, Horton 000132, Police Report of May 4, 2012.  She noticed that Mr. Sawyers's boat trailer was next to the boat ramp.  ECF 16-1 at 78, Horton 000078, Horton Affidavit ¶ 8.  Ms. Horton contacted the authorities, *id.*, who initiated a search for Mr. Sawyers "by land, air and sea."  ECF 16-1 at 132, Horton 000132, Police Report of May 4, 2012.  Ms. Horton informed the local authorities that at the time, Mr. Sawyers "was taking

---

[10]  Ms. Horton referred to Mr. Sawyers's bag as the "weatherproof bag" or the "waterproof bag" in her Affidavit.  *See* ECF 16-1 at 77, Horton 000077, Horton Affidavit  ¶¶ 5, 7.

[11]  The full hyperlink address for the *Time and Date* webpage included in the Administrative Record is not visible.  ECF 16-1 at 79, Horton 000079.

medication for diabetes, seizures, anxiety, and depression." *Id.*

At about 2:00 a.m. on April 25, 2012,[12] the sailboat was "spotted" by a United States Coast Guard ("Coast Guard") helicopter near Kurtz Beach-Patapsco River. ECF 16-1 at 134, Horton 000134, Investigative Report of Maryland Natural Resources Police dated April 25, 2012 ("Police Report of April 25, 2012").[13] The boat was "essentially on the other side of the peninsula" from where Mr. Sawyers's home is located. ECF 16-1 at 78, Horton 000078, Horton Affidavit ¶ 8. It was found "floating upside down" (ECF 16-1 at 134, Horton 000134, Police Report of April 25, 2012) in "approximately 15' — 17' feet of water." ECF 16-1 at 132, Horton 000132, Police Report of May 4, 2012. The Coast Guard "deployed a rescue swimmer to search under the sailing vessel" for Mr. Sawyers, but he was not located. *Id.*

At approximately 7:15 a.m. on April 25, 2012, Mr. Sawyers's body was "located" by the Coast Guard in "the Patapsco River off Rock Point." *Id.* The "body was found floating face down in approximately 12' feet of water." *Id.* The temperature of the water at the time was approximately 56 degrees Fahrenheit. *Id.*

The precise location of the body and its distance from the shore when found is not apparent from the Administrative Record. One online news article included in the Administrative Record reported that the body was found approximately "a mile and half southeast of the boat near the mouth of Rock Creek . . . ." ECF 16-1 at 164, Horton 000164, "Missing boater found dead in Pasadena," *Capital Gazette*, April 25, 2012. But, a Coast Guard

---

[12] The Police Report of May 4, 2012, lists the time the sailboat was found as 2:03 a.m, ECF 16-1 at 132, Horton 000132, whereas the Police Report of April 25, 2012, lists the time the sailboat was found as 2:00 a.m. ECF 16-1 at 134, Horton 000134. This discrepancy is not material.

[13] The boat was described by the police as a "14 ft. yellow sailboat," ECF 16-1 at 134, Horton 000134, and also as a 12'-15' yellow SNARK sailboat. ECF 16-1 at 133, Horton 000133.

news article, included in the Administrative Record, suggested that the body was found "about a half mile from where the sailing vessel was found." ECF 16-1 at 167, Horton 000167, "Coast Guard recovers missing boater near Pasadena, Md." *Coast Guard News*, April 25, 2012. Similarly, the Watercraft Accident Report dated May 16, 2012, prepared by the Maryland Natural Resources Police, did not offer a precise point on the river where the body was found. ECF 16-1 at 126, Horton 000126, Accident Report dated May 16, 2012 ("Accident Report").   It vaguely describes the "Location of Incident" as "Rock Creek / Patapsco River Area." *Id.*

According to the Accident Report, Mr. Sawyers suffered "Death – By drowning." *Id.* at 129, Horton 000129.  Hypothermia was listed as the "[o]ther likely cause" of death.   *Id.*  And, "Alcohol Use" was listed as a "Contributing Factor[]" to the accident.   *Id.* at 128, Horton 000128.

### C.    Death Certificate; Autopsy

On April 26, 2012, Assistant Medical Examiner Patricia A. Aronica-Pollak, M.D., Office of the Chief Medical Examiner for the State of Maryland, executed a Certificate of Death for Mr. Sawyers.  ECF 16-1 at 148, Horton 000148, Certificate of Death issued by the State of Maryland, Department of Health and Mental Hygiene, Division of Vital Records ("Death Certificate" or "Certificate").  The Certificate lists the "Immediate Cause" of death as "Drowning Complicated by Hypothermia." With respect to "Manner of Death," it states:  "Accident."  *Id.*  On the Certificate, Dr. Aronica-Pollak checked the box on the form stating:   "On the basis of examination and/or investigation, in my opinion, death occurred at the time, date and place, and due to the cause(s) and manor stated."  *Id.*  Under "Date of Injury," she wrote:  "FOUND.  Apr 25, 2012," and under "Time of Injury," she wrote:  "FOUND.  0715 hrs."  *Id.*  Thus, based on the Death Certificate, the precise time of Mr. Sawyers's death remains unclear.

Dr. Aronica-Pollak also performed an autopsy of Mr. Sawyers's body on April 26, 2012, ECF 16-1 at 136, Horton 000136, Post Mortem Examination Report dated June 19, 2012 ("Port Mortem Report").   And, she prepared the Post Mortem Report of June 19, 2012.   *Id.* at 141, Horton 000141, Post Mortem Report.

In the Post Mortem Report, Dr. Aronica-Pollak noted that when Mr. Sawyers was found he was wearing a "blue Revere Adult Universal Type 3 Vest . . . incorrectly behind the head with the right arm hole around the right arm, and the third black nylon waist strap around the left arm."   *Id.* at 136, Horton 000136.   "Only the third lowest chest strap was fastened" closed.   *Id.* She also indicated that Mr. Sawyers's sphenoid sinuses contained "watery fluid."   *Id.*   Further, she detected "[f]rothy foamy fluids in airways and nose" and "[p]ulmonary edema."   *Id.* at 141, Horton 000141.   In addition, Dr. Aronica-Pollak described multiple contusions and abrasions on the forearms, elbows, legs, shoulder, and lower lip of the decedent's body.   *Id.* at 136, Horton 000136.

Of import here, the Toxicology Report of Findings, dated April 27, 2012 ("Toxicology Report"), included in the Post Mortem Report, indicated that Sawyers's heart blood tested at 0.13% blood alcohol content ("BAC").   *Id.* at 142, Horton 000142.   However, the precise time of testing of Mr. Sawyers's blood is not apparent from the Toxicology Report.

Based on Dr. Aronica-Pollak's examination, she concluded:   "This 43 year old, White male, WILLIAM GEORGE SAWYERS, died of Drowning Complicated by Hypothermia.   The manner of death is ACCIDENT.   The deceased had been consuming alcoholic beverages prior to death."   *Id* at 000141.

### D.   *Pertinent Maryland Statutes*

At the time of the relevant events, Mr. Sawyers did not engage in illegal activity in

Maryland by operating the sailboat while allegedly intoxicated.

Maryland Code (2012 Repl. Vol.), § 11-174.1 of the Transportation Article ("Transp.") defines "Under the influence of alcohol per se" as "having an alcohol concentration at the time of testing of 0.08 or more as measured by grams of alcohol per 100 milliliters of blood or grams of alcohol per 210 liters of breath." Transp. § 21-902(a)(1) prohibits a person from driving or attempting to drive a vehicle while under the influence of alcohol. Transp. § 21-902(a)(2) prohibits driving or attempting to drive a vehicle while under the influence of alcohol per se. Transp. § 21-902(b) prohibits driving while impaired by alcohol. In reference to Transp. § 11-174.1, the Maryland Court of Appeals of Maryland has stated: "The statutory provisions making it unlawful to have a 0.08 blood alcohol concentration relate solely to the driver of the vehicle." *Maurer v. Pennsylvania Nat. Mut. Cas. Ins. Co.*, 404 Md. 60, 69, 945 A.2d 629, 634 (2007).

Several provisions of the Courts and Judicial Proceedings Article ("C.J.") of the Maryland Code (2013 Repl. Vol.) are also noteworthy. *See* C.J. §§ 10-305 – 10-308. Pursuant to C.J. § 10-307(a), in any proceeding in which a person is alleged to have committed an act that would constitute a violation, *inter alia*, of Transp. § 21-902, a person shall be considered under the influence of alcohol per se, as defined in Transp. § 11-174.1, if at the time of the testing he had a BAC of .08 or more. C.J. § 10-307(g).

Notably, as to Transp. § 21-902(a)(2), "the conduct proscribed . . . is driving or attempting to drive a motor vehicle with a blood alcohol concentration of 0.08 or more regardless of whether the driver is or is not actually under the influence of alcohol." *Maurer*, 404 Md. at 71, 945 A.2d at 635. The Maryland Court of Appeals reiterated in *Maurer*: "The offense under §§ 11-174.1 and 21-902(a)(2) is driving while having a blood alcohol concentration of 0.08 or more; the offense is not driving while actually under the influence of alcohol." *Id.* The

Maryland Court of Appeals has also said that "the test result itself does not establish intoxication." *Meanor v. State*, 364 Md. 511, 527, 774 A.2d 394, 403 (2001). Thus, to convict under Transp. § 21-902(a)(2), the State must prove driving (or attempting to drive), plus a BAC of .08 or greater. *Brown v. State*, 171 Md. App. 489, 515, 910 A.2d 571, 586 (2006) (Barbera, J.).[14]

Section 8-738(a) of the Natural Resources Article ("N.R.") of the Maryland Code (2012 Repl. Vol.) provides that a person may not operate or attempt to operate a vessel while the person is under the influence of alcohol or impaired by alcohol. But, vessels propelled by sail only are excluded from this prohibition. In particular, N.R. § 8-738(a) provides: "Subject to subsection (g) of this section, a person may not operate or attempt to operate a vessel while the person: (1) Is under the influence of alcohol [or] (2) Is impaired by alcohol." Pursuant to N.R. § 8-738(g), the "section applies to the following: (1) A vessel required to be registered with the Department under this subtitle; (2) A vessel required to have a valid number awarded in accordance with a federal law or a federally approved numbering system of another state; and (3) A vessel from a foreign country using the waters of this State."

N.R. § 8-712(a)(1) is also relevant. It provides: "Any vessel equipped with propulsion machinery of any type on the waters of the State shall be numbered for identification in accordance with this subtitle and any regulation pursuant to it." Notably, N.R. § 8-712(a)(1) states: "This provision does not apply to . . . (vi) [a] vessel propelled only by sail[.]" As a result, the State of Maryland did not require Mr. Sawyers to register his sailboat, because it was propelled only by sail.

---

[14] Judge Barbera is now the Chief Judge of the Maryland Court of Appeals.

### E.    Hypothermia

As noted, Mr. Sawyers's body was found in water with a temperature of 56 degrees Fahrenheit.    ECF 16-1 at 132, Horton 000132, Police Report of May 4, 2012.    The Death Certificate lists the "Immediate Cause" of death as "Drowning Complicated by Hypothermia." ECF 16-1 at 148.

On the subject of hypothermia, the Administrative Record contains an article published in February 2006, titled "The Chilling Truth About Cold Water," by Captain Kevin H. Monahan ("Monahan Article").    ECF 16-1 at 88-94, Horton 000088-000094.    It provides some context with respect to hypothermia and details the effects of cold water immersion on motor and cognitive faculties.   *Id.* at 88-89, Horton 00088-000089.   The Monahan Article also suggests that although death by hypothermia can take hours, the effects of cold water immersion can facilitate death by drowning within minutes.   *Id.*   It also encourages boaters to "[w]ear your lifejacket…. You might not be able to save yourself if you are not already wearing a lifejacket when you enter the water."   *Id.* at 92, Horton 00092 (internal quotations omitted).

According to the Monahan Article, when one is in water between fifty and sixty degrees Fahrenheit, without protective clothing, the average time before the loss of dexterity is ten to fifteen minutes.   *Id.* at 88-89, Horton 000088-000089.    As for temperatures below 59 degrees Fahrenheit, the Monahan Article cautions that, within the first ten minutes of cold water immersion, "even though you will have some dexterity, you may not be capable of complex tasks.   Experienced boaters have reported that they were unable to don an immersion suit in cold water.   Instead they simply became exhausted in trying."    *Id.* at 92, Horton 000092.[15]

It adds: "After **ten minutes** you will probably not have the dexterity or strength to carry

---

[15] An immersion suit is a type of full-body waterproof garment that protects the wearer from hypothermia.

out any further tasks . . . ." *Id.* at at 93, Horton 000093 (emphasis in Monahan Article).  The article elaborates:  "If you attempt to swim, you will not be able to do so efficiently—and the movement will cool you down more rapidly."  *Id.*  The Monahan Article also references the "Canadian Safe Boating Council / SmartRisk Study," which reported that "between 1991 and 2000, 41% of those who drowned while boating were within 10 meters of shore at the time.  An additional 22% were within 10 to 15 meters of shore."  *Id.* at 89, Horton 000089.  Similarly, it draws attention to "[a] British study from 1977 show[ing] that 55% of open water drownings occurred within 3 meters of safety!!! And two thirds of drowning victims were strong swimmers."  *Id.*

### F.   LINA's Initial Review

On May 21, 2012, Horton filed a claim for benefits with LINA.  ECF 16-1 at 171, Horton 000171.  The claim was assigned to LINA Accident Claim Specialist John Armstrong.  ECF 16-1 at 146, Horton 000146.  Mr. Armstrong reviewed the Accident Report and the Post Mortem Report, as well as "Stages of Acute Alcoholic Influence/Intoxication" by Dr. Kurt M. Dubowski ("Dubowski Article"), among other documents.  ECF 16-1 at 106-07, Horton 000106-000107, Letter from Mr. Armstrong to Ms. Horton dated July 10, 2012 ("Armstrong Letter").

After evaluating these materials, Mr. Armstrong wrote to Ms. Horton on July 10, 2012, stating: "[A] person with a blood alcohol level of .13% would experience impairments including 'diminished attention, judgment and control, [s]lowed information processing . . . decreased sensatory response . . . increased reaction time . . . sensory-motor incoordination; impaired balance.'"  ECF 16-1 at 107, Horton 000107, Armstrong Letter (quoting Dubowksi Article).

Mr. Armstrong also said, ECF 16-1 at 108, Horton 000108:

Policy COA 4005 and OK 819515, as previously quoted, expressly excludes benefits for "Covered Injury for Covered Loss which, directly or indirectly, in whole or in part, is caused by or results from . . . operating any type of vehicle while under the influence of alcohol or any drug, narcotic or other intoxicant. Under the influence of alcohol, for purposes of this exclusion, means intoxicated, as defined by the law of the state in which the Covered Accident occurred."

Therefore, Mr. Armstrong concluded, *id.*:

Given that Mr. Sawyers was intoxicated, as evidenced by blood alcohol level of .13% which is 125% greater than the legal limit for operating a vessel in the State of Maryland and his intoxication contributed to his capsizing and subsequent drowning, he passed away from an excluded event. As such, no benefits are payable under policy COA 4005 or OK 819515.

The Armstrong Letter also indicated: "This action is based on information in our file. If you are not satisfied or do not agree with the reason(s) for the denial of your claim, you may appeal the decision . . . ." *Id*. at 108, Horton 000108.

### G.    Horton's Appeal

On September 12, 2012, Ms. Horton appealed the denial of her claim for accidental death benefits. ECF 16-1 at 63, Horton 000063, Notice of Appeal. The appeal was assigned to CIGNA Appeals Specialist Michael James. ECF 16-1 at 59, Horton 000059, Letter from Mr. James to Mr. Martino dated October 15, 2012.

On October 18, 2012, plaintiff supplemented her appeal with a letter from a forensic pathologist, William L. Manion, M.D., Ph.D., dated October 17, 2012. ECF 16-1 at 46-50, Horton 000046-000050, Manion Letter. Dr. Manion is the "Designated Forensic Pathologist" of Burlington County and Ocean County in New Jersey. ECF 16-1 at 46, Horton 00046, Manion Letter. He also is the Chief of Pathology of Virtua Health. *Id.*

According to Dr. Manion, "no one can say that Mr. Sawyers was legally intoxicated at the time his boat capsized to any reasonable degree of medical certainty." *Id.* at 49, Horton 000049. He claimed that Mr. Sawyers might have had a blood alcohol content less than 0.08%

upon entering the water.  *Id*.  Dr. Manion theorized, *id*. at 49-50, Horton 000049-000050:

> I can present a hypothetical in which Mr. Sawyers had his three beers and Vodka and was eating some food in which he would shove off at 4 pm and start sailing. After drinking the three beers with Vodka and eating a sandwich, his blood alcohol level at 5 pm would be .076.  This is below the legal intoxication limit of .080%.  If at that time Mr. Sawyers [sic] sailboat was knocked over by a gust of wind, then Mr. Sawyers would have been tossed into the water while he was still sober and not legally intoxicated.  Because of Mr. Sawyers' height and weight and the temperature of the water I would assume that he could live for 2 to 3 hours.  As can be seen from the accompanying ethanol concentration plot, it would have shown a .135 blood alcohol at 7 pm, .132 at 7:10 pm and .130 at 7:20 pm.  It would be at that point that Mr. Sawyers died.  Therefore, it is my opinion to a reasonable degree of medical certainty that Mr. Sawyers was in fact sober when he went sailing as it was his practice to have his three beers and a shot within 1 hour of sailing and it was his practice to sail for an hour or two and then return to shore.

The Administrative Record also includes a Pharmacology Report dated October 3, 2012, which is referenced in the Manion Letter.  *Id.*  The Pharmacology Report is "registered" to Dr. Manion with the subject being Mr. Sawyers.  ECF 16-1 at 51-52, Horton 000051-000052.  The report states, *id* at 52, Horton 000052:

> At [Mr. Sawyers's] peak blood alcohol level of 0.15% at 06:00 pm the physiological effects are staggering gait, visible signs of intoxication in high percentage of subjects.  The subject is fourteen-times more likely to be responsible for a fatal car crash.  Approximately 64% of people are viewed as "drunk."

Based on this information, Mr. James determined that further review was necessary to decide whether the Policies' Intoxication Exclusion applied to plaintiff's claim.  For this evaluation, Mr. James reviewed the entire claim file and, among other things, sought the opinion of an independent records review toxicologist, Frederick W. Fochtman, Ph.D.  In a report dated December 17, 2012, ECF 16-1 at 37-38, Horton 000037-000038 ("Fochtman Report"), Dr. Fochtman wrote, *id.* at 38, Horton 000038:

Mr. Sawyers' BAC at the time of his death would have been 0.13%.[16]

***

At a BAC of 0.13% Mr. Sawyers would have been impaired from the effects of [alcohol]. His impairment would have caused him to have an increased reaction time, loss of visual acuity, and exhibiting poor judgment. His impairment would have contributed to either increased risk taking behavior or an inability to respond properly when his sailboat capsized. It appears that he attempted to put on his PFD, and if he had survived for any period of time he would have been wearing it correctly.

The record does not include any information regarding how much alcoholic beverage Mr. Sawyers had consumed, over what period of time consumed, or the amount available. When he died he was in the dissipation phase where his BAC was decreasing, his vitreous slightly higher than blood, and his urine greater than the BAC. He would have had a BAC close to or greater than 0.13% while sailing. Even if he had survived for a period of time before drowning his BAC would not have been significantly less than 0.13% while sailing and certainly not less than 0.08%.

Based on Mr. James's review of the Fochtman Report and the claim file, Mr. James determined that LINA properly denied the claim. He communicated LINA's decision to Ms. Horton's attorney on January 17, 2013. *See* ECF 16-1 at 28, Horton 000028 ("Final Denial Letter"). In the Final Denial Letter, Mr. James wrote, in pertinent part, ECF 16-1 at 30, Horton 000030:

Maryland Natural Resources Code Ann. 8-738 states that operating a vessel while under the influence of or impaired by alcohol is prohibited. Section 8-738(b)(2) states that the applicable evidentiary requirement as [sic]:

If at the time of testing an individual has an alcohol concentration that meets the definition of "under the influence of alcohol per se" in § 11-174.1 of the Transportation Article, as determined by an analysis of the individual's blood or breath, it shall be prima facie evidence that the individual was operating a vessel while under the influence of alcohol.

Maryland Transportation Section 11-174.1(a) states that:

---

[16] As noted, the Administrative Record does not indicate the time of Mr. Sawyers's death.

"Under the influence of alcohol per se" means having an alcohol concentration at the time of testing of 0.08 or more as measured by grams of alcohol per 100 milliliters of blood . . ."

Based upon the information on file as of 07/10/2012, the claims for William G. Sawyers for Group Accident Death Insurance benefits under [the Policies] were denied.  It was determined that at the time he was operating his vehicle, his sailboat, on 04/24/2012, Mr. Sawyers was over the legal limit of BAC, and this was a contributing factor to his capsizing and drowning, and payment for any loss which, in whole or in part, directly or indirectly, is caused by or resulted from his operating his vehicle while under the influence of alcohol is specifically excluded by this policy.

Mr. James added, *id.* at 31-32, Horton 000031-000032:

At the time of his death, Mr. Sawyers' BAC was 0.13%, over the legal limit for boating in Maryland.

\*\*\*

Maryland Natural Resources Code Ann. 8-738 states that operating a vessel while under the influence of or impaired by alcohol is prohibited, and defines "under the influence of alcohol" as the same as Maryland Transportation Section 11-174.1(a), which is the operator at 0.08% BAC or above.  Based on the evidence in the file, on 4/24/2012 Mr. Sawyers was operating his vehicle while intoxicated, and the impairments he was experiencing due to his intoxication would have contributed to his inability to keep his vehicle upright in the water, would have contributed to him entering the water and would have contributed to his actions after entering the water, such as his inability to properly use his personal floatation device.  As a result, . . . . [w]e have determined that Mr. Sawyers' loss is specially excluded under the provisions of policies COA 4005 and 819515.

On January 2, 2014, Ms. Horton filed suit.  Additional facts are included in the Discussion.

## II. Discussion

### *A. ERISA*

As noted, plaintiff claims benefits as the designated beneficiary under two insurance policies issued and administered by LINA as part of an employee welfare benefit plan subject to ERISA.  Pursuant to 29 U.S.C. § 1132(a)(1)(B), a civil action may be brought "to recover

benefits due to [an ERISA plan participant or beneficiary] under the terms of [the] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan."

ERISA is a "'comprehensive and reticulated statute,' the product of a decade of congressional study of the Nation's private employee benefit system," and it governs most employee benefit plans in the United States. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993) (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361 (1980)). When reviewing a denial of benefits under an ERISA-governed plan, a district court must first determine "whether the relevant plan documents confer discretionary authority on the plan administrator to make a benefits-eligibility determination." *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 869 (4th Cir. 2011) (citing *Johannssen v. District No. 1-Pac. Coast Dist., MEBA Pen. Plan*, 292 F.3d 159, 168 (4th Cir. 2002)). Here, the parties agree that such discretion has not been conferred in the Policies, and thus the denial of benefits is subject to *de novo* review. ECF 15-1 at 4, Horton Motion; ECF 15-1 at 9, LINA Motion. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111-15 (1989); *Woods v. Prudential Ins. Co. of Am.*, 528 F.3d 320, 321 (4th Cir. 2008); *Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522-23 (4th Cir. 2000); *Bartel v. Sun Life Assur. Co. of Canada*, 536 F. Supp. 2d 623, 627 (D. Md. 2008).[17]

Pursuant to a *de novo* standard of review, the court must make its own independent determination of whether plaintiff is entitled to accidental death benefits. *Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 819 (4th Cir. 2013); *Woods*, 528 F.3d at 322; *Bartel*, 536 F. Supp. 2d at 627. In the context of a *de novo* review, "the correctness, not the reasonableness, of [LINA's]

---

[17] Where discretionary authority to determine eligibility for benefits is conferred on the administrator, the court reviews the decision under the more deferential "abuse of discretion" standard. *Woods*, 528 F.3d 320 at 322.

denial of benefits is the only concern . . . ." *Johnson*, 716 F.3d at 819 (citation omitted). Moreover, in the course of a *de novo* review, a district court is generally limited to the evidence before the plan administrator. *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993). The district court may exercise its discretion to consider evidence beyond the administrative record "when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision." *Id.* However, neither side has asked the Court to consider evidence that was not presented to the plan administrator.

### B.  Fed. R. Civ. P. 56

This case is presented to the Court in the procedural posture of cross-motions for summary judgment. This is often the case in ERISA actions. *See, e.g.*, *Bond v. Marriott Int'l, Inc.*, 971 F. Supp. 2d 480, 487 (D. Md. 2013); *Kane v. UPS Pension Plan Bd. of Trustees*, No. RDB-11-03719, 2013 WL 6502874, at *1 (D. Md. Dec. 11, 2013), *aff'd*, 584 Fed. App'x 109 (4th Cir. 2014).

There is a divide among the circuit courts of appeal and a void in the Fourth Circuit as to whether Fed. R. Civ. P. 56 is necessarily the appropriate mechanism to resolve a § 1132(a)(1)(B) ERISA claim for denial of benefits. Courts have said that, under certain circumstances, Rule 52, rather than Rule 56, provides the appropriate process for resolving an ERISA denial of benefits claim. *See, e.g.*, *Muller v. First Unum Life Ins.*, 341 F.3d 119, 124-25 (2d Cir. 2003); *Hess v. Hartford Life Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001); *see also Orndorf v. Paul Revere Life Ins., Co.*, 404 F.3d 510, 517 (1st Cir. 2005) (noting that "summary judgment is simply a vehicle for deciding the issue" and "the non-moving party is not entitled to the usual inferences in its favor") (citation omitted); *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 618-19 (6th Cir. 1998) (calling into question whether "engaging [in] a procedure [under Rule 56] designed

solely to determine whether there is a genuine issue for trial" is appropriate but noting "a district court should not adjudicate an ERISA action as if it were conducting a standard bench trial under Rule 52") (internal quotation and citation omitted).

The Fourth Circuit has not taken a definitive position on the subject.  Judge Quarles of this court has observed: "Although [the Fourth Circuit] has acknowledged in *dicta* some reservations about 'importing the summary judgment standard whole-cloth into the ERISA context,' *see Phelps v. C.T. Enters., Inc.*, 394 F.3d 213, 218 (4th Cir. 2005), [it] has not adopted such a streamlined approach."  *Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 09-2612, 2012 WL 122362, at \*5 n.16 (D. Md. Jan. 12, 2012).  He also observed that "the court's functions at the summary judgment stage and at a bench trial are distinct."  *Id.*

In the absence of a material dispute of fact, district courts in the Fourth Circuit continue to use Rule 56 to resolve § 1132(a)(1)(B) ERISA claims.  *See Neumann v. Prudential Ins. Co. of America*, 367 F. Supp. 2d 969, 977-980 (D.C. Va. 2005); *see, e.g.*, *Lamb v. Nextel Commc'ns of Mid-Atl., Inc.*, No. 4:09CV149, 2010 WL 4068520, at \*4-7 (E.D. Va. Aug. 19, 2010) (magistrate's report and recommendation recognizing the "vacuum of authority" in the Fourth Circuit with respect to the use and extent of Rule 56 in deciding an ERISA case, relative to the Sixth Circuit, "which has most forthrightly addressed the issue and has determined Rule 56 motions are inapplicable for all § 1132(a)(1)(B) cases."), *report and recommendation adopted*, No. 4:09CV149, 2010 WL 4068483 (E.D. Va. Oct. 13, 2010), *aff'd*, 429 Fed. App'x 337 (4th Cir. 2011) (per curiam); *Denver v. Verizon Claims Review Comm.*, No. RDB-09-902, 2010 WL 3075149, at \*3-4 (D. Md. Aug. 3, 2010).

On the other hand, courts in the Fourth Circuit also "routinely resolve benefits denial claims through bench trials."  *Stewart*, 2012 WL 122362 at \*5; *see, e.g.*, *Watson v. Unum Life*

*Ins. Co. of America*, 126 Fed. App'x 604, 605 (4th Cir. 2005) (per curiam); *Myers v. Hercules, Inc.*, 253 F.3d 761, 765 (4th Cir. 2001).  In *Neumann*, 367 F. Supp. 2d at 980, for example, the court recognized that "there are ERISA § 1132(a)(1)(B) claims that involve no disputes of material fact, but merely a dispute over whether the undisputed facts are sufficient to trigger benefits under a plan's [provisions].[ ]   In these circumstances, summary judgment is appropriate."  But, in *Neumann*, the court determined that summary judgment was "plainly inappropriate" in the case that was pending, because the record was "bristling with disputed material issues of fact," including varied expert opinions.  *Id.*   Therefore, it ruled as the factfinder, "based on the paper record. . . ."  *Id.*

Notably, neither party has requested a bench trial pursuant to Rule 52.   And, in the absence of explicit Fourth Circuit jurisprudence rejecting Rule 56 as a valid standard upon which to evaluate a § 1132(a)(1)(B) ERISA claim, the Rule 56 standard may well be appropriate, so long as the court is satisfied that there is no *genuine dispute of material fact*.  In the event of a material dispute of fact, however, resolution under Rule 52 appears appropriate.[18]

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  As the Fourth Circuit recently observed, Fed. R. Civ. P. 56 "is a mechanism to obviate trial . . . ."  *Boyer-Liberto v. Fontainbleau Corp.*, 752 F.3d 350, 355 (2014), *rehearing en banc granted* July 1, 2014; *reargued* September 18, 2014.

---

[18] Because the parties have not requested resolution under Rule 52 and are not on notice as to this issue, I would not proceed at this time, in the context of the cross motions for summary judgment, to resolve the case under Rule 52.

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine dispute as to material fact "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.*; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013); *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012).

Of import here, in the context of summary judgment, the court does not sit as the trier of fact. The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, on summary judgment, the trial court may not make credibility determinations. *Jacobs v. N.C. Admin. Office of the Courts*, __ F.3d ___, No. 13-2212, 2015 WL 1062673, at *4 (4th Cir. Mar. 12, 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black &. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). Indeed, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See, e.g., Boone v. Stallings*, 583 Fed. App'x. 174, 176 (4th Cir. 2014) (per curiam).

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted), *cert. denied,* 540 U.S. 822 (2003); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). "Both motions must be denied if the court finds that there is a genuine issue of material fact. But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Wright, Miller & Kane, *Federal Practice & Procedure* § 2720, at 336–37 (3d ed. 1998, 2012 Supp.).

### C. *Principles of Contract Interpretation*

Plaintiff's entitlement to benefits under the Policies "turn[s] on the interpretation of the terms in the plan at issue." *Firestone Tire,* 489 U.S. at 115; *see, e.g.*, *Johnson*, *supra*, 716 F.3d at 819–21 (examining language of ERISA insurance policy provision to determine plan participant's eligibility).

A primary purpose of ERISA is to "ensure the integrity of written, bargained-for benefit plans." *United McGill Corp. v. Stinnett,* 154 F.3d 168, 172 (4th Cir. 1998). *See Jenkins v. Montgomery Indus., Inc.*, 77 F.3d 740, 743 (4th Cir. 1996) (stating that general principles of contract law require that federal courts enforce "the plan's plain language in its ordinary sense") (internal quotation marks and citations omitted). "To achieve this objective, the plain language of an ERISA plan must be enforced in accordance with its literal and natural meaning." *Mid Atl. Med. Servs., LLC v. Sereboff*, 407 F.3d 212, 220 (4th Cir. 2005) (internal quotation marks omitted), *aff'd,* 547 U.S. 356 (2006). In this regard, "'[c]ourts construe ERISA plans, as they do other contracts, by 'looking to the terms of the plan' as well as to 'other manifestations of the parties' intent.'" *US Airways, Inc. v. McCutchen,* —— U.S. ——, 133 S. Ct. 1537, 1549 (2013)

(quoting *Firestone Tire*, 489 U.S. at 113).  And, courts should determine the ordinary meaning of terms "as a reasonable person in the position of the plan participant would have understood the words."  *Johnson*, 716 F.3d at 820 (internal citations omitted).  If the terms of a contract are unambiguous, the court may interpret the contract as a matter of law. *World–Wide Rights Ltd. P'ship v. Combe Inc.,* 955 F.2d 242, 245 (4th Cir. 1992).

"ERISA plans, like contracts, are to be construed as a whole." *Id.*  Thus, in interpreting a plan, "[c]ontract terms must be construed to give meaning and effect to every part of the contract, rather than leave a portion of the contract meaningless or reduced to mere surplusage." *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1127 (4th Cir. 1993) (citation omitted).  And, "a court should be hesitant to depart from the written terms of a contract . . . in a case involving ERISA, which places great emphasis upon adherence to the written provisions in an employee benefit plan."  *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 56 (4th Cir. 1992).  As the Supreme Court recently said in *US Airways, Inc.*, *supra*, 133 S. Ct. at 1548, ERISA's "statutory scheme . . . is built around reliance on the face of written plan documents." (Internal quotation marks omitted).  If an ambiguity remains after giving the language its ordinary meaning, it must be construed "against the drafter, and in accordance with the reasonable expectations of the insured." *Wheeler v. Dynamic Engineering, Inc.,* 62 F.3d 634, 638 (4th Cir. 1995) (citations omitted).

ERISA generally preempts state law.  "Although courts apply federal common law rules of contract interpretation when construing a policy governed by ERISA, [they] look to 'principles of state common law to guide [their] analysis.'" *Johnson*, 716 F.3d at 819 (internal citations omitted) (quoting *Wheeler*, 62 F.3d at 638); *see Jenkins*, *supra*, 77 F.3d at 744.

Accordingly, the Policies are interpreted with reference to both federal and Maryland contract law principles, which are largely the same.

### D.   Intoxication Exclusion

The parties dispute whether the Intoxication Exclusion precludes coverage of accidental death benefits with respect to Mr. Sawyers's death.  For convenience, I shall quote again the terms of the Intoxication Exclusion in the Policies.  It states, ECF 16-1 at 203, Horton 000203, Group Accident Policy OK819515; ECF 16-1 at 232, Horton 000232, Group Accident Policy COA 004005:

> [B]enefits will not be paid for any Covered Injury or Covered Loss which, directly or indirectly, in whole or in part, is caused by or results from any of the following unless coverage is specifically provided for by name in the *Description of Benefits* Section:
>
> * * *
>
> 10.   operating any type of vehicle while under the influence of alcohol or any drug, narcotic or other intoxicant.  Under the influence of alcohol, for purposes of this exclusion, means intoxicated, as defined by the law of the state in which the Covered Accident occurred.

The insured must prove the occurrence of a covered loss, but an insurer seeking to deny coverage based on a policy exclusion bears the burden of proving that the loss falls within an exclusion under the policy.  *Jenkins*, *supra*, 77 F.3d at 744; *Mut. Fire Ins. Co. of Calvert Cnty. v. Ackerman,* 162 Md. App. 1, 7–8, 872 A.2d 110, 113 (2005); *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256-57 (2d Cir. 2004); *Blair v. Metropolitan Life Ins. Co.*, 974 F.2d 1219, 1221 (10th Cir. 1992); *see also McGee v. Equicor-Equitable HCA Corp.*, 953 F.2d 1192, 1205 (10th Cir. 1992) ("It is a basic rule of insurance law that the insured carries the burden of showing a covered loss has occurred and the insurer must prove facts that bring a loss within an exclusionary clause of the policy.") (citations omitted).

It follows that LINA must prove that the loss is within the purview of the Intoxication

Exclusion.   This issue involves two questions:   (1) whether Mr. Sawyers was "under the influence of alcohol" while operating the sailboat, within the meaning of the Intoxication Exclusion; and if so, (2) whether Sawyers's intoxication while operating the sailboat caused his death, directly or indirectly, in whole or in part.  I address each issue in turn.

### 1. *Intoxication*

The parties dispute whether Mr. Sawyers was "under the influence of alcohol . . . as defined by the law of [Maryland]," within the meaning of the Intoxication Exclusion.  ECF 16-1 at 203, Horton 000203, Group Accident Policy OK819515; ECF 16-1 at 232, Horton 000232, Group Accident Policy COA 004005.  *Compare* LINA Motion, ECF 16 at 11-13 (citing, *inter alia*, *Balthis v. AIG Life Ins. Co.*, 5 Fed. App'x 320 (4th Cir. 2001)), *with* ECF 17-1 at 5-7, Horton Reply (citing, *inter alia*, *Maurer v. Pennsylvania Nat. Mut. Cas. Ins. Co.*, 404 Md. 60, 945 A.2d 629 (2007)).  To be sure, the Toxicology Report determined that Mr. Sawyers's body, at the time of its recovery, had a blood alcohol content of 0.13%.  ECF 16-1 at 142, Horton 000142, Toxicology Report .

Nevertheless, Ms. Horton points out that Mr. Sawyers could lawfully operate his sailboat while drinking alcohol, without fear of criminal reprisal.  ECF 15-1 at 6-7, Horton Memo. Although N.R. § 8-738(a) provides that a person may not operate or attempt to operate a vessel in Maryland while the person is under the influence of alcohol or impaired by alcohol, vessels propelled by sail only, such as the SNARK here, are excluded from this prohibition.  Because the decedent did not violate Maryland law by sailing the motorless vessel while drinking, Ms. Horton maintains that the intoxication exclusion does not apply.  ECF 15-1 at 6-7, Horton Memo.

In LINA's view, "the issue of [Sawyers's] right legally to sail while intoxicated is

entirely independent from the issue of whether he was intoxicated in the first instance." ECF 16

at 11, Horton Motion.[19]   Relying on *Balthis*, 5 Fed. App'x 320, defendant argues, ECF 16 at 13-

14, LINA Motion:

> [W]hile Maryland law does not specifically define a BAC limit for sailing, it does
> define intoxication in terms of BAC for a number of other purposes, all at levels
> well below that of Mr. Sawyers's 0.13%. In fact, Maryland law defines anything
> in excess of a BAC of 0.08% as "intoxicated *per se*" for purposes of motor
> vehicle infractions. Md. Code Ann., COURTS AND JUDICIAL PROCEEDINGS § 10-
> 307(g). The same 0.08% standard applies to operating a powered vessel on the
> water. Md. Code Ann., NATURAL RESOURCES § 8-738. And the proposed bill
> before the Maryland legislature that would extend drunken boating laws to
> sailpowered vessels would also apply the 0.08% limit. (*See Pl.'s Mot. Summ. Jud.*
> at Ex. 3). Summary judgment should be granted because the findings of the
> medical examiner are undisputed that Mr. Sawyers had a BAC of 0.13% at the
> time of his death. (HORTON 000142). And, in keeping with the jurisprudence of
> *Balthis*, Mr. Sawyers was intoxicated by any statutory definition in Maryland.

 In the Policies, the term "intoxicated" is tied to the definition in the particular state

where the accident occurred.  *See* ECF 16-1 at 203, Horton 000203, Group Accident Policy

OK819515; ECF 16-1 at 232, Horton 000232, Group Accident Policy COA 004005, Intoxication

Exclusion.  In Maryland, as noted, the word "intoxication" and the phrase "under the influence of

alcohol" are generally defined in the context of the operation of motorized vehicles, including

boats.  But, as the Fourth Circuit said in *Balthis*, 5 Fed. App'x at 322, construing North Carolina

law, an intoxication exclusion may apply even if the decedent was not committing an illegal act

under applicable state law.  Rather, the clause "means that the parties intended to look to the law

of whatever state the accident occurred in" to obtain a definition of intoxication.  *Id.*

Notwithstanding the parties' disagreement as to whether, under Maryland law, Mr.

Sawyers could be regarded as intoxicated if his activity was not illegal, there remains a genuine

---

[19] I pause to note that, in LINA's Final Denial Letter, LINA relied, *inter alia*, on its view
that, under Maryland law, Mr. Sawyers violated the law by operating the sailboat while
intoxicated. *See*, *e.g.*, ECF 16-1 at 30-32.  Horton 000030-000032.

dispute of material fact as to Mr. Sawyers's blood alcohol content during a critical window of time—the time when he was operating the sailboat, prior to his entry into the water. Indeed, the precise times of when he entered the water, when he died, and how much time elapsed between when he died and when he was found, have not been established.

There were no witnesses to the incident, nor is there any concrete information about the chronology of events. Significantly, the Death Certificate lists only a time that the body was found and offers no estimate as to the time of death or injury. ECF 16-1 at 148, Horton 000148, Death Certificate. Yet, plaintiff estimates that "Mr. Sawyers was likely in the water for 13 to 14 hours before his body was found." ECF 15-1 at 8, Horton Motion.

As noted, the Toxicology Report, performed hours after the accident, found a blood alcohol level of 0.13%. ECF 16-1 at 142, Horton 000142, Toxicology Report. But, the experts interpret these results quite differently.

Significantly, LINA's expert, Dr. Fochtman, observed: "The record does not include any information regarding how much alcoholic beverage Mr. Sawyers had consumed, over what period of time consumed, or the amount available." ECF 16-1 at 38, Horton 00038. Yet, Dr. Fochtman opined, ECF 16-1 at 38, Horton 00038:

> When [Mr. Sawyers] died he was in the dissipation phase where his BAC was decreasing, his vitreous slightly higher than blood, and his urine greater than the BAC. He would have had a BAC close to or greater than 0.13% while sailing. Even if he had survived for a period of time before drowning his BAC would not have been significantly less than 0.13% while sailing and certainly not less than 0.08%.

Dr. Manion, plaintiff's expert, asserted that, depending on when Mr. Sawyers consumed the alcohol in relation to when he entered the water, he may have been below a 0.08% blood alcohol level while operating the sailboat. ECF 16-1 at 49, Horton 00049, Manion Letter. Further, Dr. Manion opined that "no one can say that Mr. Sawyers was legally intoxicated at the

- 29 -

time his boat capsized to any reasonable degree of medical certainty." *Id.*  He explained, *id.* at

49-50, Horton 00049-00050:

> I can present a hypothetical in which Mr. Sawyers had his three beers and Vodka
> and was eating some food in which he would shove off at 4 pm and start sailing.
> After drinking the three beers with Vodka and eating a sandwich, his blood
> alcohol level at 5 pm would be .076.  This is below the legal intoxication limit of
> .080%.  If at that time Mr. Sawyers sailboat [sic] was knocked over by a gust of
> wind, then Mr. Sawyers would have been tossed into the water while he was still
> sober and not legally intoxicated.  Because of Mr. Sawyers' height and weight
> and the temperature of the water I would assume that he could live for 2 to 3
> hours.  As can be seen from the accompanying ethanol concentration plot, it
> would have shown a .135 blood alcohol at 7 pm, .132 at 7:10 pm and .130 at 7:20
> pm.  It would be at that point that Mr. Sawyers died.

Thus, the Administrative Record reflects a dispute of material fact as to the level of Mr.

Sawyers's BAC when he operated the boat.  In the context of summary judgment, the court does

not serve as the trier of fact.  At this stage of the case, when presented with conflicting expert

opinions as to a critical fact, it is not the function of the court to resolve the facts or to make

credibility determinations.  *See Jacobs*, *supra*, __ F.3d ___, 2015 WL 1062673, at *4.

In my view, there is no merit to plaintiff's argument that, as a matter of law, Sawyers

could not have been intoxicated if his activity was legal.   Nonetheless, on the issue of Mr.

Sawyers's BAC during the window of time when he was operating the vessel, analyzed in the

Rule 56 context, there is a genuine dispute of material fact.  It follows that I cannot determine, in

the context of summary judgment, whether or not Sawyers was intoxicated while he was sailing.

### 2. *Causation*

Assuming that Mr. Sawyers was intoxicated, within the meaning of the Intoxication

Exclusion, the question remains whether, based on the Administrative Record, LINA satisfied its

burden to establish that Mr. Sawyers's operation of the sailboat while intoxicated caused his

death, directly or indirectly, in whole or in part.

According to LINA, only "minimal" causation is required by the Policies' language, and intoxication "'need not be the only or sole cause of the covered loss.'"  LINA Motion, ECF 16 at 14 (*quoting Randall v. Life Ins. Co. of N. Am.*, No. 11-CV-367-JHP, 2013 WL 1286006, at *6 (E.D. Ok. Mar. 27, 2013)).  Defendant's points are well taken.  Indeed, several federal district courts examining similar policy language have arrived at the same conclusion.  *See, e.g., James-Smith v. Total Affiliates Accidental Death & Dismemberment Ins. Plan*, No. 3:10 CV 2640, 2011 WL 4899992, at *6 (N.D. Ohio Oct. 13, 2011) (concluding that "[t]he plain meaning of the entire exclusion only requires that death '"*in whole or in part*, is caused by or results from . . . operating any type of vehicle under the influence of alcohol . . .'", thus necessitating only a "[*d*]*e minimis*" level of causation) (quoting the policy) (emphasis in *James-Smith*); *Cornish v. U.S. Life Ins. Co. of the City of New York*, No. 6-CV-344-DW, 2009 WL 3231351, at *9 (W.D. Ky. 2009) ("[S]o long as the intoxication of the deceased is shown to have played any role in bringing about . . . death, the causal requirement will be satisfied."); *Giangreco v. U.S. Life Ins. Co.*, 168 F. Supp. 2d 417, 422 (E.D. Pa. 2001) (interpreting an exclusion precluding "any loss . . . caused directly, indirectly, wholly or partly by . . . being intoxicated" to mean when alcohol "plays any role in causing a loss, that loss is not covered").

In keeping with the rules of contract construction outlined earlier, and giving effect to the plain language of the Intoxication Exclusion at issue here, it is clear that the operation of a vehicle while intoxicated need not be the sole cause of the loss so as to trigger application of the exclusion.  On the other hand, intoxication, in and of itself, does not automatically bar recovery of benefits under the plain language of the Policies.  The text of the Policies does not provide that an insured is automatically excluded from benefits solely on the basis of blood alcohol content.  To the contrary, under the language of the Policies there must be some evidence of the

role of alcohol in the loss, beyond the insured's intoxicated state, to establish the applicability of the exclusion.

Numerous federal cases from various jurisdictions have considered the issue of causation within the context of an alcohol or drug-related accident and a policy exclusion similar to the one at issue here. These courts have reached conflicting results as to whether causation has been established based on the particular facts of the case and the language of the exclusion in question. Cases involving causation and other types of exclusions are also helpful in elucidating the type of evidence upon which courts rely to find a causative link between a covered loss and an exclusion. These cases suggest that, to resolve the issue, the court must sometimes "slosh through the bog" and "split hairs so finely . . . ." *Gordon v. Metropolitan Life Ins. Co.*, 256 Md. 320, 325, 260 A.2d 338, 340 (1970) (Digges, J.).[20]

*Ciberay v. L-3 Commc'ns Corp. Master Life & Acc. Death & Dismemberment Ins. Plans*, No. 3:12-CV-1218-GPC-MDD, 2013 WL 2481539, at *1 (S.D. Cal. June 10, 2013), *appeal dismissed* (Oct. 25, 2013), is instructive. In *Ciberay*, the plaintiff sought judicial review of an insurer's decision to deny her claim for benefits under her deceased husband's accidental death and dismemberment policy. *Id.* at *1. The plaintiff's husband had died nine days after "falling down a set of stairs while intoxicated." *Id.* After his fall, his blood alcohol level measured 0.422%. *Id.* at *2.

---

[20] The term "bog" is a shorthand reference to "Serbonian Bog," which was "John 'Milton's name for Lake Sarbonis in Lower Egypt, a marshy tract . . . covered with shifting sand.'" *Buce v. Allianz Life Ins. Co.*, 247 F.3d 1133, 1144 n.2 (11th Cir. 2001) (citation omitted). The expression derives from Justice Cardozo's dissent in *Landress v. Phoenix Ins. Co.*, 291 U.S. 491 (1934), an insurance case involving the "metaphysical distinction between 'accidental means' and 'accidental results' that has [long] bedeviled the courts . . . ." *Buce*, 247 F.3d at 1142.

Initially, the medical examiner determined that the cause of death was "hypertensive cardiovascular disease, with the following other significant conditions: alcohol abuse, pelvic fractures, obesity, and diabetes mellitus." *Id.* at *3.   The manner of death was listed as an accident.  *Id.*   Later, the medical examiner amended the medical report to indicate that the cause of death was "complications following pelvic fractures, with the following other significant conditions: hypertensive cardiovascular disease, alcohol abuse, obesity, and diabetes mellitus." *Id.*  Other medical testing revealed "'a large massive pulmonary embolism . . . .'"  *Id.*

Based on these facts, the insurer denied the wife's claim for accidental death benefits, *id.*, based on the policy's intoxication exclusion, which precluded benefits for "'any loss caused in whole or in part by, or resulting in whole or in part from the following . . . the Insured Person being under the influence of drugs or intoxicants . . . .'"  *Id.* at *1.  The insurer had determined that, due to the deceased's blood alcohol level of 0.422%, which can cause "ataxia, tremors, disorientation, disturbed equilibrium and up to unconsciousness, depressed respiration, and even death," the loss was not covered.  *Id.* at *4 (internal quotation omitted).  The plaintiff agreed that the insured was intoxicated when he fell, but insisted that he did not die due to intoxication.  *Id.*

The parties filed cross motions for summary judgment.  Upon review, the *Ciberay* Court applied a deferential standard of review of arbitrary and capricious, and awarded summary judgment to the plaintiff.  In so ruling, the court highlighted the lack of evidence to establish causation and noted, *id.* at *8 n. 2:

> The record lacks any clear indication that Mr. Ciberay exhibited any of the purportedly typical effects associated with a blood alcohol level of .422%, which, according to Defendant, include: ataxia, tremors, disorientation, disturbed equilibrium, depressed respiration, unconsciousness, and death. To the contrary, the record indicates Mr. Ciberay was able to move all four extremities on command, was alert and oriented, experienced pain on standing (implying he was able to stand), was breathing normally, was conscious, and was alive. Moreover, prior to his fall, Mr. Ciberay had been playing with his grandson in an upstairs

room. Thus, given the apparent contradiction of its generic list of typical effects with Mr. Ciberay's actual state at the time of his fall, the Court finds it was unreasonable for Defendant not to further investigate the cause of Mr. Ciberay's fall.

The court added, *id.* at *14:

Other than a generic list of the typical effects associated with a blood alcohol level similar to that of Mr. Ciberay's at the time of his fall—which, importantly, appears to be entirely contradicted by Mr. Ciberay's activity before falling and by his disposition when paramedics arrived as set forth in Footnote 2 above—one may only speculate as to what actually caused Mr. Ciberay to fall. The fall may have been, as Plaintiff posits, related to the type of footwear Mr. Ciberay was wearing (if any), the type of flooring on the stairs, the fact that Mr. Ciberay was carrying dishes, or any combination of these and other factors. In short, Defendant relies on the fact that Mr. Ciberay was intoxicated without sufficiently tying Mr. Ciberay's intoxication to his death.

Of particular relevance here, the *Ciberay* decision underscores that, notwithstanding a minimal burden of proof and a deferential standard of review, an insurer cannot merely rest upon blood alcohol level and a generic list of alcohol's effects to establish a causative link between intoxication and loss. This principle requiring an insurer to meet its causation burden with evidence applies generally to various policy exclusions.

For instance, in *Kellogg v. Metropolitan Life Insurance Company*, 549 F.3d 818 (10th Cir. 2008), the insurer denied a claim for accidental death benefits pursuant to the policy's sickness exclusion, which provided for the exclusion of benefits for any loss caused or contributed to by, *inter alia*, physical illness. *Id.* at 821. There, the insured crashed into a tree and died at the hospital. *Id.* at 820. A witness who observed the accident stated she noticed the driver appeared to be having a seizure before veering into the tree. *Id.* The medical examiner concluded that the insured suffered a "subarachnoid hemorrhage" and a "basilar skull fracture" from a "solo motor vehicle accident." *Id.* The autopsy further revealed that the insured had Bupropion in his bloodstream at the time of his death and that this drug had "a reported risk

factor of seizures." *Id.* at 820-21.  Upon review of the insurer's denial of benefits pursuant to the physical illness exclusion, the district court granted summary judgment in favor of defendants. *Id.* at 819.

On appeal, the Tenth Circuit considered whether the insurer had established that the seizure had caused the accident, a necessary hurdle to bring the loss within the purview of the exclusion.  *Id.* at 829.  In deciding whether the insured's death was "caused" by his apparent seizure, the Tenth Circuit concluded that "the car crash—not the seizure—caused the loss at issue, i.e., [the insured's] death."  *Id.*  Therefore, the court determined that the exclusionary clause of the policy did not apply, reversed entry of judgment in favor of the defendant, and directed the district court to enter judgment in favor of the plaintiff.  *Id.* at 833.

*Giangreco v. United States Life Ins. Co.*, 168 F. Supp. 2d 417, 422-23 (E.D. Pa. 2001), echoes the result in *Ciberay*.  There, the court considered summary judgment motions as to an insurance policy that excluded from coverage "any loss . . . caused directly, indirectly, wholly or partly by . . . being intoxicated or under the influence of any drug, unless taken as prescribed by a physician."  *Id.* at 420.

The accident at issue began when a car driven by Renee Snyder swerved to the right, causing a car in the adjacent lane to swerve into the lane of the insured, Nicholas Giangreco, Jr. *Id.* at 420.  Mr. Giangreco also swerved to the right, apparently to avoid the vehicle entering his lane.  *Id.*  As a result, his car struck the curb and then a telephone pole.  Mr. Giangreco was ejected from the vehicle and died.  *Id.* at 420.  Based on a toxicology report, Mr. Giangreco "was legally intoxicated at the time of his death," and also had trace amounts of marijuana in his blood.  *Id.* at 421.  Ms. Snyder, the driver who initiated the chain of events resulting in the insured's death, was also legally intoxicated and pleaded guilty to homicide by vehicle.  *Id.*

When the beneficiaries of Mr. Giangreco's accidental death plan submitted a claim for benefits, the insurer denied the claim on the basis of an intoxication exclusion, which excluded from coverage "any loss . . . caused directly, indirectly, wholly or partly by . . . being intoxicated or under the influence of any drug, unless taken as prescribed by a physician." *Id.* at 420.

The insurer contended that an unimpaired driver would have been able to avoid injury. *Id.* at 422. The court construed the exclusion to convey that "if the use of unprescribed drugs or alcohol by the insured plays any role in causing a loss, that loss is not covered." *Id.* Based on the witness accounts indicating that the accident happened over the course of only a few seconds, plaintiffs argued that even a sober driver would have been unable to avoid the accident. The court found that the insurer "reasonably concluded that the insured was legally intoxicated at the time of the accident." *Id.* at 423. But, on the record presented, it appeared that the insurer "reflexively denied the claim upon learning that the insured was intoxicated without meaningfully pursuing issues of causation." *Id.* Therefore, the court denied the insurer's summary judgment motion, based on disputed material facts regarding causation as to the fatality. *Id.* at 424. Notwithstanding that the insurer needed only to prove that the intoxication played *some* role in the accident, the court said: "One could reasonably find on the record presented that the accident and loss were not caused 'directly, indirectly, wholly or partly' by the insured's use of alcohol or drugs." *Id.* at 423.

*Hastie v. J.C. Penney Life Ins. Co.*, 115 F.3d 895 (11th Cir. 1997), mirrors this outcome. In *Hastie*, the insured died after colliding with a vehicle that had switched into his lane. *Id.* at 896. At the time of his autopsy, the insured's blood alcohol level was measured at 0.254%. *Id.* As to the cause of death, "[t]he death certificate listed 'multiple blunt traumatic injuries' as the immediate cause of death, 'motorcycle-motor vehicle accident' as the 'underlying cause' of

death and 'acute alcohol intoxication' as a 'significant condition contributing to death but not resulting in the underlying cause.'" *Id.*

The insurance company denied an application for accidental death benefits submitted by the insured's wife based on two intoxication exclusions. *Id.* One exclusion provided: "'No benefit shall be paid for Loss caused by or resulting from . . . an Injury occurring while the Covered Person is intoxicated . . . .'" *Id.* The other exclusion provided: "'No benefit shall be paid for any loss . . . which is caused by or results from . . . an Injury occurring while the Covered Person is intoxicated."' *Id.* The insurer argued that the insured's intoxicated status triggered the exclusions. *Id.* at 897. The Eleventh Circuit rejected this argument as unreasonable, reversed the district court's entry of summary judgment in favor of the defendant, and remanded. *Id..* The *Hastie* Court concluded that some proof of a causal connection between the insured's intoxication and his death was required. *Id.* at 896-97.

The Fifth Circuit's decision in *Smith v. Liberty Life Ins. Co.*, 535 F.3d 308 (5th Cir. 2008), is also edifying. There, the decedent drove his vehicle off the road in broad day light and struck two trees. A toxicology report indicated that, at the time of the insured's death, the insured had "potentially lethal levels of the drug hydrocodone in his system." *Id.* at 310. Invoking the policy's intoxication exclusion, the insurer declined to pay accidental death benefits. *Id.* at 311. The exclusion precluded the recovery of benefits for "'death which results directly or indirectly, in whole or in part, from: . . . (e) injury occurring while under the influence of alcohol, or (f) drugs (including but not limited to narcotics, hypnotics, and amphetamines), unless administered on the advice of a physician . . . .'" *Id.* at 310 (quoting the policy). The district court granted summary judgment to the insurer.

In affirming the district court, the Fifth Circuit did not rely only on the toxicology report to find a correlation between the intoxication and the death.  To be sure, laboratory tests revealed "a potentially lethal level of hydrocodone" in the decedent's system.  *Id.* at 317.  And, a pathologist testified that the "diazepam and hydrocodone in [the decedent's] system would have caused drowsiness, slowed mental activity, decreased alertness, and slowed reflexes."  *Id.* Moreover, according to the pathologist, the drugs would have impaired the ability to operate a motor vehicle.  *Id.*  However, the court also observed that decedent drove his vehicle off the road "in the middle of the day for no apparent reason," and collided with two trees.  *Id.* at 317.  And, the court also rejected the plaintiff's theory that the decedent had a higher tolerance to drugs, based on his twenty-year history of severe drug and alcohol abuse.  *Id.* at 312.  Thus, the Fifth Circuit determined that "the correlation between drugs and [the decedent's] death is uncontroverted."  *Id.* at 317.

In *Watson v. Unum Life Ins. Co., supra*, 126 Fed. App'x at 605, the Fourth Circuit, in a short, per curiam decision, affirmed the denial of ERISA benefits based on an alcohol exclusion. The insured, who was killed in a motor vehicle accident, had a BAC of .175%.  *Id.*  But, the evidence also showed that he drove at "a high rate of speed" and "lost control of the vehicle . . . ."  *Id.*  In other words, there was evidence of driver error, which could be attributed to the BAC.

*James-Smith*, *supra*, 2011 WL 4899992, another ERISA case, is also informative.  The insured, Paul Smith, was travelling northbound on his motorcycle with a passenger riding with him.  *Id.* at *1.  As Mr. Smith approached an intersection, he began to accelerate.  *Id.*  Soon thereafter, a southbound car entered the intersection and began to turn left in front of Mr. Smith. *Id.*  The driver of the car never saw the motorcycle.  *Id.*  "A horrific collision resulted, ejecting

both occupants of the motorcycle." *Id.* The driver of the automobile was severely injured, but Mr. Smith did not survive. *Id.* A witness reported that although Mr. Smith swerved in an attempt to avoid the collision, he did not brake. *Id.* At the time of the accident, Mr. Smith's blood alcohol content was 0.09%. *Id.*

The insurer denied coverage under a group accidental death plan based on language identical to the exclusion at issue here: "'[B]enefits will not be paid for any Covered Injury . . . which, directly or indirectly, *in whole or in part,* is caused by or results from . . . operating any type of vehicle under the influence of alcohol . . . .'" (emphasis in *James-Smith*). *Id.* at *2. In reviewing the administrator's decision under the arbitrary and capricious standard, the court highlighted four pieces of evidence that rendered the decision to deny benefits reasonable, *id.* at *6 (internal citations omitted):

> First, state troopers immediately suspected Smith had been impaired. Second, the accident report indicates Smith did not attempt to brake before the collision. Third, a medical certificate lists Smith's 0.9% BAC as a "Significant Condition" contributing to death. Finally, Trooper Scherley reported Smith's intoxication "definitely . . . would have slowed down his reaction time."

Unlike in this case, in *James-Smith* there were witnesses who observed the conduct of the driver. And, the evidence showed that the driver failed to brake when he should have.

In *Dipper v. Union Labor Life Ins. Co.*, 400 F. Supp. 2d 604, 607-08 (S.D.N.Y. 2005), another ERISA case, Jeffrey Dipper sought benefits pursuant to his accidental death and dismemberment policy. The insurer denied his claim, citing a provision of the insurance policy excluding "'loss caused by or resulting from . . . an injury that occurs because the insured in intoxicated.'" *Id.* at 609. In reviewing the insured's denial of benefits *de novo*, the court granted summary judgment to the insurer. The court relied on witness accounts of plaintiff's impairment

at the time of the accident.  But, it also emphasized the absence of any other potential cause of
the accident.

Dipper and three friends were in an all-terrain vehicle ("ATV"), driving up an inclined
road.  *Id.* at 606.  While navigating the trail, the ATV hit a "bump or rock" causing it to "stand
up on its rear" and then "flip over backwards."  *Id.* at 607.  As a result, "[p]laintiff was struck in
the face by some part of the vehicle, and was thrown from the vehicle."  He suffered severe
trauma to his face and lost sight in both eyes.  A toxicology report revealed plaintiff's blood
alcohol level was 0.127% at the time of the accident.  *Id.*  A police report stated: "'It was found
upon investigation that all occupants were drinking alcohol and contributed to the accident.'"  *Id.*
at 608 (internal citations omitted).  But, "the report [did] not state how, or by whom, this
conclusion was made."  *Id.*  Moreover, the plaintiff denied that he was intoxicated.  *Id.* at 611.

The court found that "the circumstances of the accident outweigh[ed] the plaintiff's self-
serving statement that he felt no negative effects of inebriation."  *Id.* at 611.  Although the court
said that "a mechanical comparison with New York's legal limit of .08 BAC is not
determinative," the court found it "informative" as to whether the insured's ability "to operate an
overloaded ATV was impaired."  *Id.*  The court concluded that the record supported an inference
of harm caused by intoxication.  *Id.*  It explained, *id.* at 611 (emphasis in *Dipper*):

> In light of a valid finding of intoxication, the record (including numerous accident
> and hospital reports) more than supports an inference that the harm to the plaintiff
> was *caused* by the plaintiff's intoxication. Plaintiff managed to upend a heavy,
> six-wheel ATV while driving on a path with no other traffic or distractions. A
> reasonable trier of fact could conclude that a sober individual would have seen
> and avoided the rock or bump that caused the accident; would have discredited
> the statements of his friends (who, if not intoxicated, had at least been drinking)
> that the road was clear; would have rebalanced the ATV before heading uphill so
> that several hundred pounds of weight were not concentrated on or behind the rear
> axle; or would have reconsidered the drive entirely. Where the record indicates
> that plaintiff's judgment and reflexes were impaired, and that an accident occurred

that was the product of impaired judgment and reflexes, an inference that the one caused the other may be logically drawn.

The court also found it significant that the plaintiff offered no alternative cause for the accident.  It said, *id.* at 612:

> Plaintiff has submitted no affidavits from his friends about that evening; no evidence that the Polaris ATV was prone to low-speed rolling and tipping; no evidence about abnormal conditions on the trail prior to the accident. Plaintiff's bare assertion that the trier of fact lacked sufficient information to make a determination must be weighed against the complete absence of any evidence that would cause the claims examiner to find otherwise.

*Vickers v. Boston Mutual Life Insurance Co.*, 135 F.3d 179 (1st Cir. 1998), is also informative.  There, the insurer denied coverage based on a sickness exclusion in the policy.  *Id.* at 180.

In *Vickers*, the insured had a heart attack while driving and died after crashing into a tree. Relying on the policy's illness exclusion, the insurer denied coverage even though the death certificate listed the cause of death as "'[m]ultiple blunt force traumatic injuries secondary to motor vehicle accident precipitated by acute coronary insufficiency.'"  *Id.*  In reversing the denial of benefits and affirming the district court's entry of judgment in favor of plaintiff, the court found: "The undisputed facts are that the crash was caused by Vicker's heart attack, but the sole physiological cause of death was the physical injury sustained in the crash. The heart attack alone would not have been fatal."  *Id.* at 180.

In the cases cited above, in which the courts were asked to determine whether there was a causative link between the accident and an intoxication exclusion or another exclusion, the courts generally relied on direct evidence of driver error to support causation, *see, e.g.*, *Smith*, 535 F.3d at 317 (noting that the insured's vehicle veered off the road and collided into two trees); *James-Smith*, *supra*, 2011 WL 4899992, at *6 (noting that the insured police observed the insured's

conduct and the insured failed to brake prior to the collision); *Dipper*, 400 F. Supp. 2d at 611 (noting that the insured failed to avoid the bump in the road), or the absence of any evidence to support an alternative theory of causation, such as adverse weather conditions. *See, e.g.*, *Smith*, 535 F.3d at 317 (noting that the insured was driving in broad day light in clear conditions); *Dipper*, 400 F. Supp. 2d at 611 (highlighting "no evidence about abnormal conditions on the trail prior to the accident" or "evidence that the [vehicle] was prone to low-speed rolling or tipping"); *cf. Bickel v. Sunbelt Rentals, Inc.*, WMN-09-2735, 2010 WL 3938348, at *5 (D. Md. Oct. 6, 2010) (noting in an ERISA case where the policy had no causation requirement that "even if there had been a causation requirement in the exclusion, that requirement would be met here . . . . [given] that the road conditions on the night of the accident were dry and [the police report] identified no other adverse conditions.").

Significantly, there are no clear facts here to support any sailor error made by Sawyers. Nor were there any witnesses to the events in question.   Rather, LINA presents a general discussion of the effects of alcohol on one's ability to perform various tasks.

As LINA concedes, the records show that from 4:00 to 6:00 p.m. on April 24, 2012, the wind speed remained around ten to eleven miles per hour, "which would have been significant for a vessel with an upper tolerance of 18 mph."  ECF 16 at 16, LINA Motion (citing ECF 16-1 at 82, Horton 000082, Climatological Report).  And, LINA notes that the wind direction shifted 40 degrees, from 270 to 310 "*within an hour* meaning that constant adjustments would need to be made to keep the boat tacking properly." *Id.* (emphasis supplied by LINA) (citing ECF 16-1 at 82, Horton 000082, Climatological Report).  Moreover, as defendant recognizes (ECF 18 at 13, LINA Reply), the conditions created "a challenging environment for the tiny SNARK

sailboat," which was not stable in such wind.  This gives rise to an inference that the gust could have caused the sailboat to capsize, without regard to the BAC of the sailor.

At the end of the day, the parties offer theories and speculation as to what actually occurred.

Plaintiff asserts, ECF 15-1 at 7-8, Horton Memo:

> Given Mr. Sawyers' experience as a sailor and his swimming abilities, the most reasonable explanation for the accident was the dramatic twenty mile per hour wind gust at 5:54 p.m.  The Sailboat was not equipped to handle gusts of this speed and capsized unexpectedly.  After Mr. Sawyers hit the water, he had a few minutes to retrieve his PFD and try to fasten it the best he could before losing his motor skills.  Mr. Sawyers' reasoning was not diminished by alcohol consumption in that he put on his PFD the best he could, considering he was already injured and losing dexterity from the cold water.   Mr. Sawyers was likely in the water for 13 to 14 hours before his body was found.  No one, drunk or sober, could have survived for a period of time in water that cold that long of a period.

Plaintiff also emphasizes that the medical examiner concluded that Mr. Sawyers "died of Drowning Complicated by Hypothermia.  The manner of death is ACCIDENT."  *Id*.  Although the medical examiner noted that Mr. Sawyers had been consuming alcoholic beverages prior to death, there was no finding that the accident itself was caused by Mr. Sawyers's consumption of alcohol.

On the other hand, LINA suggests that the "challenging environment" that plaintiff offers as the cause of the accident (ECF 18 at 13, LINA Reply) underscores the need for Mr. Sawyers to have been of sound mind and body while sailing, and not inebriated.   LINA argues that Sawyers could have navigated the waters successfully, and would have been able to handle an unexpected wind gust or unusually windy conditions, if he were sober.  *Id.* at 13-14.

LINA posits, ECF 16 at 16, LINA Motion (internal citations and quotations omitted):

> In short, Mr. Sawyers would have had to be actively engaged with the boat and reacting to changes in the sailing environment.  The symptoms of a BAC of 0.13% include increased reaction time, loss of visual acuity, and exhibiting poor

judgment. When these factors are combined with the challenging nature of the winds at the time, there would have been a high likelihood of improper or delayed control inputs resulting in pitching or rolling motions sufficient to knock a [sic] Mr. Sawyers backward or overboard.

Further, LINA characterizes plaintiff's recitation of the events as "inferences and speculation." ECF 18 at 13, LINA Reply. Defendant explains, *id.*:

Plaintiff relies on speculation to assert that Mr. Sawyers could not have survived this incident regardless of his intoxication, that Mr. Sawyers was thrown from the boat as it capsized as a result of a specific gust of wind, and further speculates that the boat capsizing and Mr. Sawyers falling overboard were simultaneous and related events.

LINA offers generic information of the typical effects associated with a blood alcohol level similar to that of the insured. To be sure, defendant contends that alcohol impaired Mr. Sawyers's ability to handle the wind and negotiate the sailboat. But, it offers no evidence that, if Mr. Sawyers had not been drinking, the boat would not have capsized. Unlike the vehicular accident cases mentioned above, the record here, in the light most favorable to plaintiff, does not establish that the boat capsized because of any error, action, or inaction by Sawyer. Put another way, there is no evidence (expert or otherwise) that a sailor with Mr. Sawyers's level of experience who had not been drinking would have been able to prevent the SNARK from capsizing.

Mr. Sawyers's entry into the water may have been, as defendant posits, related to his alcohol-intake. But, it is equally likely that it was due to the documented gust of wind or the wind conditions generally. ECF 16-1 at 82, Horton 000082, Climatological Report.

Recognizing this gap in the record, defendant shifts gears and insists that Mr. Sawyers's ability to save himself once thrown into the water was diminished by his level of intoxication. In this way, defendant contends that Mr. Sawyers's intoxication at least indirectly caused his death. Defendant explains, ECF 18 at 14, LINA Reply:

Unlike the "unknowns" pointed to by Plaintiff which cold have affected Mr. Sawyers' actions or chances of survival—such as weather, the wind speed, the water temperature, the water current, the time of the accident, or the location of the accident—the effects of alcohol on Mr. Sawyers can be established as a causal factor regardless of what other events took place that day.   Furthermore, the effects of alcohol on Mr. Sawyers' survival are borne out by supporting evidence in the record.   For instance, despite being an experienced sailor, Mr. Sawyers was unable to re-board or right the small craft in accordance with standard procedures for a man-overboard or capsizing event.   In addition Mr. Sawyers was unable to properly don his PFD despite having at least 15 minutes to do so before Plaintiff asserts he would have lost dexterity.   Finally despite being a strong swimmer, Mr. Sawyers failed to make the swim to shore.   All of these factors would have affected Mr. Sawyers' changes of survival and all would also have been affected by Mr. Sawyers' intoxication.

Defendant assumes that the floatation device was at Mr. Sawyers's fingertips when he entered the water, and therefore, Mr. Sawyers should have been able to secure it quickly and properly.   ECF 18 at 14.   But, it is also plausible that, when the boat capsized, Mr. Sawyers was some distance from the floatation device.   And, unlike land, the water was moving; he may have had to swim to reach it.   If that were the case, the fact that he was able to retrieve the floatation device at all, and secure it to his body, while managing to stay afloat in frigid waters, seems to lend credence to plaintiff's theory of the case.

The defendant also seems to overlook that Mr. Sawyers may have been hampered by injury, as evidenced by the multiple contusions and abrasions on his body.   ECF 16-1 at 136, Horton 000136, Post Mortem Report.   This may have affected his ability to "right the small craft. . . ."   ECF 18 at 14, LINA Reply.

In addition, any contentions about Mr. Sayers's abilities to don the lifejacket or right the boat must account for the cold temperature of the water.   Indeed, hypothermia was listed on the Post Mortem Report, *see id.* at 141, Horton 000141, and Death Certificate as a cause of death. *See* ECF 16-1 at 148, Horton 000148, Death Certificate.   Notwithstanding Mr. Sawyers's BAC, given the apparent crippling effect of cold water immersion on a person's cognitive and

neuromuscular faculties, *see* ECF 16-1 at 88-94, Horton 000088-000094, Monahan Article, it seems Sawyers may have died from hypothermia in any event, as the autopsy determined.

Even if Sawyers had promptly and properly secured his lifejacket, the Administrative Record does not suggest that doing so would have enabled him to swim to shore, right the boat, or survive the frigid temperatures until rescued.  In this way, the generalized information about the effect of cold water immersion on one's cognitive and motor faculties in the Administrative Record may serve as a counterweight to the generic evidence in the record about the effects of alcohol.  *See* ECF 16-1 at 88-94, Horton 000088-000094, Monahan Article.

Defendant's position is tantamount to the argument that the presence of blood alcohol above a certain limit automatically establishes causation and precludes coverage as a matter of law.  But, the Policies do not include a per se bar to recovery based on a certain blood alcohol content.  Although the degree of causation defendant must establish is *de minimis*, the Policies do not create a categorical bar to recovery based on a particular blood alcohol level.

As explained in *James-Smith*, *supra*, 2011 WL 4899992, at *6 (citations omitted), the language of the Policies is determinative.  There, the court said, *id.*:

> Alcohol exclusions generally take two forms. The first is an absolute bar to recovery if death or injury occurs while legally intoxicated regardless of causation. Under such provisions, the court's analysis begins and ends with whether the covered person was intoxicated at the time of death.  The second form requires some showing of causation.  In these types of exclusions, the insurance provider has the burden to establish the causal link between the intoxication and the injury.

LINA could have written its Policies to provide for an absolute bar to any recovery based on intoxication of the insured.  But when, as here, the exclusion clearly requires causation, "[m]ere reference to [the insured's] intoxication . . . is not enough," even if intoxication itself is not in dispute.  *Id.*  A causative link is required.  To illustrate, the beneficiary of an insured driver

of a motor vehicle, who drove while intoxicated, would not be excluded from coverage if the insured's vehicle was struck and killed by a falling tree while the insured was driving.  In that scenario, the blood alcohol level had nothing to do with the occurrence.

Moreover, "[n]o circuit court considering drunk driving crashes has approved a claims administrator's use of a *per se* rule in the context of ERISA accidental death policies." *Firman v. Becon Const. Co.*, 789 F. Supp. 2d 732, 745 (S.D. Tex. 2011), *order amended and supplemented* (June 3, 2011), *aff'd sub nom.*, *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533 (5th Cir. 2012) (declining to adopt a *per se* rule that all alcohol-related collisions are non-accidental and therefore not covered under an insurance policy).  In cases when the question is whether a collision involving an impaired driver is an "accident," courts have consistently rejected a categorical determination that all alcohol-related deaths or injuries are non-accidental. *See*, *e.g.*, *Eckelberry v. Reliastar Life Ins. Co.*, 469 F.3d 340, 347 (4th Cir. 2006) (declining to adopt a "per se rule" that "car crashes caused by drunk driving can never be accidents") (citation omitted); *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 802 (10th Cir. 2010) ("Courts have consistently rejected such a per se rule, as would we.") (citations omitted); *Kovach v. Zurich Am. Ins. Co.*, 587 F.3d 323, 331 (6th Cir. 2009) (declining to impose a blanket standard allowing insurers to consider injuries resulting from any collision in involving an intoxicated driver as nonaccidental).

The focus of the "accident" inquiry is distinguishable from the question at issue here, because whether a loss is an accident often centers on the foreseeability of the loss, as opposed to the cause of the loss. *See e.g.*, *Eckelberry*, 469 F.3d at 344-45.  Nonetheless, the same rationale cautioning against adoption of a *per se* rule based solely on blood alcohol level is apt here. Based on the language of the Policies, LINA cannot rely on Mr. Sawyers's intoxication without

sufficiently tying it to his death.

As noted, pursuant to Rule 56, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute concerning a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, *supra*, 477 U.S. at 248. Based on my review of the Administrative Record, I conclude such a dispute of fact remains with respect to causation, which precludes entry to judgment in defendant's favor.

Given the absence of any evidence as to the circumstances in which or when Mr. Sawyers entered the water, defendant relies heavily on Mr. Sawyers's BAC of 0.13%. ECF 16-1 at 142, Horton 000142, Toxicology Report. When considering LINA's Motion, and when viewing the entire Administrative Record, as I must, in the light most favorable to Horton as the non-movant, I conclude that LINA is not entitled to summary judgment as a matter of law, because a reasonable factfinder could find that Mr. Sawyers's death was not caused in whole or in part, directly or indirectly, by his alleged intoxication. The experts dispute whether Sawyers entered the water with a BAC of 0.13%. And, the wind conditions, paired with the temperature of the water, offer a plausible alternative cause of the occurrence.

Similarly, I must deny plaintiff's request for entry of summary judgment as a matter of law. As stated earlier, "[w]hen cross-motions for summary judgment are submitted to a district court, each motion must be considered individually, and the facts relevant to each must be viewed in the light most favorable to the non-movant." *Mellen v. Bunting*, 327 F.3d at 363 (citation omitted).

In the light most favorable to LINA, a factfinder could conclude that Mr. Sawyers had a

blood alcohol content of 0.13% while sailing the vessel and when he entered the water, and that his BAC adversely affected his ability to handle the sailboat in view of the wind conditions. In addition, a reasonable factfinder could determine that, as defendant posits, because Sawyers was intoxicated when he entered the water, he was unable to right the sailboat and get himself out of the frigid water. That reasonable minds could disagree as to the weight of the evidence in the Administrative Record on the issue of causation precludes entry of judgment in plaintiff's favor. *See Jacobs*, *supra*, __ F.3d ___, 2015 WL 1062673, at *4.

In light of the current posture of the case and the competing and reasonable narratives about what may have happened to Mr. Sawyers on April 24, 2012, I decline to resolve the facts on summary judgment. "[E]ven if the facts are undisputed, summary judgment may not be granted where there is disagreement over inferences that can be reasonably drawn from those facts." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 433 (3d Cir. 1996). Evaluating the persuasiveness of conflicting evidence in the Administrative Record is beyond the scope of the Court's function under Rule 56.

### E. Covered Accident

In the alternative, defendant argues that the denial of benefits was proper because the Policies cover only accidental deaths—those resulting from a "sudden, unforeseeable, external event that results, directly and independently of all other causes." ECF 16 at 18, LINA Motion (quoting ECF 16-1 at 227, Horton 000227, Group Accident Policy COA 004005). According to defendant, the events of April 24, 2012, were foreseeable, and thus it was not an accident within the meaning of the Policies. *Id*. In defendant's view, it follows that "where there is no accident, naturally there is no payable benefit." *Id*. This basis for denial was not provided to plaintiff in

LINA's initial or final denial letters.  *See* ECF 16-1 at 106-09, Horton 000108-000106,

Armstrong Letter; ECF 16-1 at 28-33, Horton 000028-000033, Final Denial Letter.[21]

In reviewing the denial of accidental death benefits sought by an ERISA plan beneficiary,

a court should consider only the reasons for the adverse benefits determination offered in the

denial notice.  *Hall v. Metro. Life Ins. Co.,* 259 Fed. App'x. 589, 593 (4th Cir. 2007) (quoting

*Thompson v. Life Ins. Co. of N. Am.,* 30 Fed. App'x. 160, 164 (4th Cir. 2002)); *Shelby Cnty.*

*Health Care Corp. v. Majestic Star Casino,* 581 F.3d 355, 369 (6th Cir. 2009) (holding that a

plan administrator cannot support its argument on appeal with a fact not relied upon in its initial

denial of benefits); *King v. Hartford Life & Acc. Ins. Co.*, 414 F.3d 994, 1004 (8th Cir. 2005)

(declining to consider *post hoc* rationale for denial of coverage offered by insurer not expressed

when benefits were denied); *Ferguson v. United of Omaha Life Ins. Co.*, No. WMN-12-1035,

2014 WL 956886 (D. Md. Mar. 11, 2014) ("[T]his court 'may not' and will not 'consider a new

reason for claim denial offered for the first time on judicial review.'") (citing *Thompson*, 30 Fed.

App'x. at 164); *cf. Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 394 (5th Cir. 2006) (rejecting

insurer's shifting justification on appeal for its decision to deny benefits and holding failure to

identify the expert upon which it relied meant that insured was unable to challenge the insurer's

information or to obtain meaningful review of the reason his benefits were terminated).

ERISA provides:  "In accordance with [applicable regulations], every employee benefit

plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has

---

[21] I also note that the definition of Covered Accident could not have been the reason for
the initial denial.   In "Cigna Group Insurance – CFS Claim Referral Form" dated November 15,
2012, LINA appeals specialist Michael James wrote: "Do you think we should be using
Definition of Accident when it involved boating under the influence?"  ECF 16-1 at 16, Horton
000016.

been denied for a full and fair review by the appropriate named fiduciary of the decision denying

the claim." 29 U.S.C. § 1133.  ERISA's implementing regulations explain that a claimant must

initially be provided with, *inter alia*, "[t]he specific reason or reasons for the adverse

determination," and "[r]eference to the specific plan provisions on which the determination is

based." 29 C.F.R. § 2560.503–1(g)(1)(i)–(ii).  Thereafter, the claimant must be provided with

"the opportunity to submit written comments, documents, records, and other information relating

to the claim for benefits," and the claims administrator must take any such materials submitted

into account in deciding the appeal.  § 2560.503–1(h)(2)(ii), (iv).

The Fourth Circuit has stated, in an unpublished case, *Hall*, 259 Fed. App'x at 593:

> The statutory and regulatory text and the case law demand that judicial review
> take into account only reasons for an adverse benefits determination offered in the
> initial denial notice, because these are the only rationales on which a claimant
> might have arguably been given a 'full and fair' opportunity to respond during the
> administrative process.

In this respect, a plan administrator "may not initially deny benefits for one reason, and

then turn around and deny benefits for an entirely different reason, after an administrative appeal,

without affording the claimant an opportunity to respond to the second, determinative reason for

the denial of benefits." *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 501 (6th Cir.

2010).  To consider LINA's post hoc alternative rationale, offered for the first time on judicial

review, would violate the spirit and purpose of ERISA.  Therefore, I decline to consider this

argument.

### III. Conclusion

For the foregoing reasons, I will deny the motions for summary judgment.  I will proceed to a bench trial, presumably on the papers, after the parties have had an opportunity to review this Opinion.  An Order follows.


Date: March 30, 2015                    _____/s/_____
                                                    Ellen Lipton Hollander
                                                    United States District Judge